UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

S & L OIL, INC., a California
corporation; S & L Oil, JV,
a California Joint Venture;
and THREE WIVES, INC., a
California Corporation,

No. 2:07-cv-01883-MCE-KJM

       Plaintiffs,

   v.

**MEMORANDUM AND ORDER**

ZURICH AMERICAN INSURANCE
COMPANY, a New York Corporation,

       Defendant.
_____

AND RELATED COUNTER ACTION.


----oo0oo----


    This case arises from the refusal, by Defendant and Counter-

Claimant Zurich American Insurance Company ("Zurich") to cover

losses asserted by Plaintiffs, the alleged owners of underground

petroleum storage tanks in Temecula, California, for pollution

investigation and remediation expenses incurred as a result of

tank discharges.

1

Zurich issued a so-called claims made and reported policy to Counter-Defendant Nick Goyal and denied coverage for Plaintiff's claims against the policy, primarily on grounds that no timely notice within the applicable coverage term was provided so as to trigger coverage.  Plaintiffs proceeded to sue, alleging breach of contract, declaratory relief to establish coverage, and breach of the implied covenant of good faith and fear dealing stemming from Zurich's allegedly wrongful refusal to extend policy benefits.  Zurich, for its part, counterclaimed for declaratory relief that its policy did not in fact provide coverage given the circumstances of the claim.  Both sides now move for summary judgment, and Zurich alternatively also requests summary adjudication as to specific issues.  As set forth below, the Court finds that summary judgment is warranted as to Zurich's counterclaim in its entirety.

**BACKGROUND**

At all times pertinent to this litigation, Plaintiff S & L Oil owned and operated the Ynez Shell Station located at 26880 Ynez Road in Temecula, California.[1]  Zurich's Statement of Undisputed Facts ("UF"), No. 1.
///
///
///

---

[1] On or about November 16, 2007, well after the events pertinent to this case took place, ownership of the Station was apparently transferred pursuant to a dissolution agreement to S & L's successor in interest, Plaintiff Three Wives, Inc.

Zurich issued a claims made and reported policy to Counter-Defendant Nick Goyal,[2] an individual affiliated with Plaintiffs, on the underground tanks at the Station on March 29, 2001.  The Zurich policy were thereafter renewed on an annual basis.  Zurich UF No. 21.

The facts here are largely uncontroverted. First, with respect to the Zurich policy itself, it is undisputed that its provisions remained unchanged from March of 2001 through 2005.  Id. at 27.[3] The insuring clause provides coverage for cleanup activities occasioned by tank discharge in pertinent part as follows:

**I.    INSURING AGREEMENT COVERAGE A: FIRST PARTY CLEANUP DISCOVERY**

> We will pay on behalf of the "insured" any "cleanup costs" required by "governmental authority" as a result of a "releases(s)" that "emanates from" a "scheduled storage tank system(s)" at a "scheduled location", that commences on or after the "retroactive date" and is first discovered by the "insured" during the "policy period", provided the "claim" is reported to us during the "policy period", or any applicable extended reporting authority.

Id.  The policy is specifically denominated as a claims made and reported policy, since it is activated only where a claim for cleanup costs is asserted by a governmental authority as a result of a discharge both discovered during the applicable policy period and reported to Zurich within either the same policy period, or an extended period as provided in the policy.

---

[2] Goyal, and not the actual owner of the Station, S & L, was the named insured on the Zurich policy.  The S & L entities were not added as insureds by way of endorsement until December 1, 2007, after this lawsuit was filed.  Zurich's Separate Statement of Undisputed Facts No. 25.

[3] The uncontroverted terms of the Zurich policy are set forth within Zurich's Undisputed Fact No. 27.

1    The policy defines "cleanup costs" as including both

2 investigation and remediation expenses with regard to tank

3 leakage, stating that

4    F.  "Cleanup costs" means:

5    1.  The necessary expenses incurred in the
     investigation, removal, remediation, neutralization, or
6    immobilization or contaminated soil, surface water,
     groundwater, or other contamination.....
7

8 Id.  The term "claim", in turn, is defined as the seeking of

9 payment for cleanup costs required by governmental authority.

10 Id.  The policy specifically excludes any cleanup cost arising

11 from a release known to the insured prior to effective date of

12 the policy period, which in this case is the annual period set

13 forth in the declarations:

14    **IV.   EXCLUSIONS**

15    This insurance does not apply to "claim(s)", "cleanup
      costs" or "loss(es)' based upon or arising out of:
16
17    A.  Any "release" known to an "insured" prior to the
      effective date of the policy Period;

18 Id.

19    Finally, in providing additional provisions for the

20 reporting of claims, Zurich relaxes any requirement that a claim

21 be both made and discovered within the same policy period by

22 allowing the insured to report a potential claim and allowing

23 that report to suffice for purposes of an actual claim later made

24 by a governmental authority:

25 ///

26 ///

27 ///

28 ///

4

**B.   NOTICE OF POTENTIAL CLAIM**

If during the "policy period" the "insured" discovers a
"release" which may reasonably be expected to give rise
to a "claim" under the policy, the "insured" shall
provide notice to us as soon as possible during the
"policy period" containing particulars sufficient to
identify an "insured" and reasonably obtainable
information with respect to:

> 1.   The time, place, "scheduled location",
> "scheduled storage tank system" description, and
> circumstances of the "release", including how and
> when the "insured" first became award of or made
> the discovery of the "release";
>
> 2.   The names and addresses of any injured parties
> and available witnesses;
>
> 3.   All investigative or engineering reports, data
> or information including "release" detection tests
> or procedures, such as system tightness tests or
> site checks, undertaken to investigate whether a
> suspected "release" has taken place;
>
> 4.   All other relevant information about the
> "claim", "release", "cleanup costs" or Loss;

and any subsequent "claim" arising from the reported
"release" made by or against the "insured" and reported
to us... shall be deemed for the purposes of this
insurance to have been made on the date on which
written notice of the "release" was received by us.

Id.

We turn now to the factual backdrop against which the Zurich

policy provisions apply.  On July 11, 2001, the Riverside County

Department of Environmental Health inspected the Ynez Shell

Station and identified a "high liquid alarm condition" with

respect to the tanks.  Zurich UF No. 2.  The Report prepared as a

result of the inspection stated that the violations identified

were to be corrected within twenty days.  Id. at No. 3.

///

///

///

5

1    Thereafter, on June 17, 2003 the California Water Quality
2    Control Board ("Board") issued a Notice of Responsibility Re:
3    Unauthorized Release to S & L Oil.  Id. at No. 7.  The Board
4    followed that Notice with an Investigation Order dated
5    September 5, 2003.  That Order required Plaintiffs to engage in
6    soil and groundwater investigation and submit an adequate
7    technical report of such investigation by December 30, 2004.  The
8    Order detailed specific content that had to be included within
9    the report for purposes of conducting the "analysis needed to
10   determine a cost-effective cleanup method."  Id. at No. 9.

11   It is further undisputed that on or about April 22, 2002,
12   Plaintiffs contracted with Tracer Research Corporation to
13   investigate tank conditions.  Id. at No. 5.  A report prepared by
14   Tracer following testing done between May 20, 2002 and July 12,
15   2002 revealed a "significant release" in Tank 1.  Moreover,
16   additional testing performed the following year confirmed that
17   "an unauthorized release of MTBE vapors had occurred" and that
18   the source was "vapor release near Tank 1."  Id. at No. 6.

19   Plaintiffs responded by hiring yet another consultant,
20   Kleinfelder Inc., to perform the necessary investigation.  On or
21   about February 4, 2004, Kleinfelder submitted a Preliminary Site
22   Conceptual Model and Work Plan for Initial Site Assessment to the
23   Board on behalf of S & L.  Id. at No. 12.  In July of 2004,
24   Kleinfelder installed three monitoring wells and performed one
25   soil boring.  Id. at No. 14.  Despite this investigation and
26   subsequent reports submitted to the Board, on January 7, 2005 the
27   Board issued a Notice of Violation to Plaintiffs indicating that
28   Kleinfelder's technical report was inadequate and incomplete.

6

Additionally, on July 13, 2005, the Board issued an additional letter mandating that additional tasks be performed in relation to the "assessment and mitigation of petroleum contamination" at the Ynez Shell Station". Id. at No. 17. That letter included an admonition that Plaintiffs could be ordered to reimburse the State for all reasonable costs incurred by the Board for investigation and cleanup of unauthorized waste discharge.

It is undisputed that Plaintiffs failed to contact Zurich, at any time between July of 2001 and January of 2006, about either the tank discharge, the Board's orders/directives, or the costs incurred in the investigation and remediation of the groundwater contamination and the Ynez Shell Station site. Id. at No. 18. Goyal nonetheless proceeded to make a claim against the Zurich policy for such costs incurred by S & L.

On or about May 25, 2006, Zurich denied Goyal's claims because he failed to comply with specific claims made and reported provisions in the Zurich policy, and because the "known loss" exclusion also precluded coverage. Id. at No. 29. After re-reviewing the claim at the request of both Goyal and his counsel, Zurich reiterated its denial on November 16, 2006 and again on June 15, 2007. Id. at No. 30. This lawsuit followed.

///
///
///
///
///
///
///

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-324 (1986).

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense.  See Fed. R. Civ. P. 56(a) ("A party seeking to recover upon a claim ... may ... move ... for a summary judgment in the party's favor upon all or any part thereof."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); France Stone Co., Inc. v. Charter Township of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992). The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a), 56(c); Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

> A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. at 323(quoting Rule 56(c)).

///

1  If the moving party meets its initial responsibility, the burden
2  then shifts to the opposing party to establish that a genuine
3  issue as to any material fact actually does exist.  Matsushita
4  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87
5  (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-
6  89 (1968).

7       In attempting to establish the existence of this factual
8  dispute, the opposing party must tender evidence of specific
9  facts in the form of affidavits, and/or admissible discovery
10 material, in support of its contention that the dispute exists.
11 Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that
12 the fact in contention is material, i.e., a fact that might
13 affect the outcome of the suit under the governing law, and that
14 the dispute is genuine, i.e., the evidence is such that a
15 reasonable jury could return a verdict for the nonmoving party.
16 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52
17 (1986); Owens v. Local No. 169, Assoc. of Western Pulp and Paper
18 Workers, 971 F.2d 347, 355 (9th Cir. 1987).  Stated another way,
19 "before the evidence is left to the jury, there is a preliminary
20 question for the judge, not whether there is literally no
21 evidence, but whether there is any upon which a jury could
22 properly proceed to find a verdict for the party producing it,
23 upon whom the onus of proof is imposed."  Anderson, 477 U.S. at
24 251 (quoting Schuylkill and Dauphin Improvement Co. v. Munson, 81
25 U.S. 442, 448 (1871)).
26 ///
27 ///
28 ///

As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

**A.    Failure to comply with policy provisions dooms Plaintiffs' bid for coverage under the Zurich policy.**

As a claims made and reported policy, Coverage A under the Zurich policy is triggered only where "cleanup costs" are required by "governmental authority" as a result of a contaminant release first discovered during the policy period, provided the "claim" is also reported to Zurich during the policy period. "Cleanup costs" are unambiguously defined as including expense incurred for both investigation, removal and remediation of contaminants.

10

The term "claim", in turn, is defined as notice by the insured to Zurich of a release for which payment of "cleanup costs" is required by governmental authority.  <u>See</u> Zurich UF No. 27.  As the policy's description of the claims made and reported coverage makes clear, "'claim(s)' must first be made by or against the insured during the 'policy period' and 'claim(s)' must be reported to us during the 'policy period'".  <u>Id</u>.

Under applicable New York law,[4] an insurance policy is a contract subject to standard principles of contractual interpretation.  <u>In re Estates of Covert</u>, 735 N.Y.S.2d 879, 884-85 (N.Y. 2001)  Where contractual terms are clear and unambiguous, their interpretation is a matter of law for determination by the Court.  <u>Harrison v. National Union Fire Ins. Co.</u>, 653 N.Y.S.2d 75, 78 (N.Y. 1996).  Unambiguous contractual terms should be given their plain and ordinary meaning (<u>Covert</u>, 735 N.Y.S.2d at 884-85), and courts should refrain from rewriting a policy or finding an ambiguity where none exists.  <u>Adorable Coat Co. v. Connecticut Indem. Co.</u>, 556 N.Y.S.2d 37, 39 (N.Y. 1990).  Moreover an insured's compliance with the reporting/notice requirements of a liability insurance policy is a condition precedent for coverage.  <u>Reynolds v. Aetna</u>, 696 N.Y.S.2d 563, 566-67 (N.Y. 1999).  The terms of claims made and reported policies have been strictly enforced.

///

---

[4] Under the terms of Zurich's policy, all matters of policy meaning/interpretation are to be decided in accordance with New York law.  Zurich UF No. 27.  Plaintiffs do not dispute the application of New York law in this regard.  <u>See</u> Pls.' Opp'n to Zurich Mot., 3:26-27.

11

1    See, e.g., Gomez v. Feder, Connick, & Goldstein, P.C., 687

2    N.Y.S.2d 679, 679-80 (N.Y. 1999); Lehmann v. Engel, & Continental

3    Cas. Co., 469 N.Y.S.2d 168, 170 (N.Y. 1983).

4         The provisions of the Zurich policy are not ambiguous.  The

5    plain language of the policy requires that the insured must have

6    first discovered and reported the release as well as related

7    governmental orders/directives during the policy period.  This

8    clearly did not occur in the instant case.

9         There undisputedly was no notice whatsoever to Zurich of any

10   claim against the policy until January of 2006, or during the

11   policy renewal period extending between March 25, 2005 and

12   March 29, 2006.  There can be no doubt under the facts of this

13   case that Plaintiffs knew about the release, as well as

14   governmental directives concerning its investigation/remediation,

15   well before March 25, 2005.  Plaintiffs admit that they were

16   advised of potential tank leakage as early as July of 2001,

17   nearly four years previously.  Zurich UF No. 2.  Plaintiffs

18   further admit that investigative work with respect to potential

19   leaks were performed in both 2002 and 2003, after which an

20   unauthorized release of contaminants was identified.  Id. at Nos.

21   4-6.  With regard to directives imposed by governmental

22   authority, it is equally undisputed that the California Water

23   Quality Control Board issued a Notice of Responsibility Re:

24   Unauthorized Release on or about June 17, 2003, and an

25   Investigation Order in September of 2003 requiring the

26   preparation of a detailed technical report adequate to determine

27   a cost-effective cleanup method.  Id. at Nos. 7, 9.

28   ///

1    Plaintiffs thereafter engaged yet another contractor in 2004
2    before it was advised by the Board in January of 2005 that the
3    report prepared by the retained contractor, Kleinfelder, was
4    technically inadequate.  Id. at Nos. 14, 16.

5         Given this knowledge, Plaintiffs' failure to report the
6    claim until January of 2006 prevents them from even qualifying
7    for coverage under the insuring clause of the Zurich policy.[5]
8    Plaintiffs were obligated to report the claim both when they
9    received confirmation that a release had indeed occurred, in
10   August of 2002, and following receipt of the Board's
11   Investigation Order in 2003.  They did neither.  Plaintiffs'
12   attempt to circumvent this failure by arguing that the policy
13   terms are unambiguous and should consequently not be enforced is
14   unpersuasive.

15        First, a specific monetary demand for cleanup costs is not
16   required to trigger the policy's notice and reporting
17   requirements.

18   ///
19   ///
20   ///
21   ///
22   ///
23   ///
24

25        [5] While Plaintiffs concede that investigation costs incurred
26   before 2006 are uncompensable under the notice provisions of the
     Zurich policy and accordingly have removed expenses incurred in
     that regard from their present policy claims (see Pls.' Opp., p.
27   10, n.1), that admission does no more than confirm that none of
     the claims asserted are proper, since timely notice of claims is
28   a condition precedent of any coverage.

1  To the contrary, the policy unambiguously includes investigation

2  expenses within the definition of cleanup costs,[6] and such

3  expenses unquestionably were incurred by 2004,[7] when Kleinfelder

4  submitted a Preliminary Site Conceptual Model and Work Plan,

5  installed monitoring wells and performed soil boring.  Zurich UF

6  No. 12, 14.[8]  There is nothing unclear about how the term

7  investigation is used in the Zurich policy.

8  ///

9  ///

10  ///

11  ///

12  ///

13  ///

14

15  _____

16  [6] As indicated above, the term "claim" is defined in the
Zurich policy as a release entailing the payment of "cleanup
costs", which in turn includes expenses incurred in

17  investigation.  The fact that the Zurich policy specifically
defines "claim" differentiates the circumstances of the present

18  case from cases cited by Plaintiffs in arguing that an actual
"demand for money" is implicit within the term.  See, eq.,

19  American Ins. Co. v. Fairchild Industries, Inc., 56 F.3d 435, 439
(2d Cir. 1995) (the policy did not define "claim"); Windham Solid

20  Waste Mgmt. Dist. v. Natural Cas. Co., 146 F.3d 131, 134 (2d Cir.
1998) ("the Policy contains no formal definition of the term

21  "claim"); In re Ambassador Group, Inc. Litigation, 830 F. Supp.
147, 153 (E.D.N.Y. 1993) ("'Claim' and 'claim made' are not

22  defined in the Policy").

23  [7] Although it is true that costs to confirm the existence of
a release do not qualify as "cleanup costs" as that term is

24  defined by the policy, the investigation performed in 2004 was
well after the release itself had been confirmed in 2002 and

25  2003.

26  [8] Plaintiffs' papers specifically admit that active
investigation was underway before the March 29, 2005 policy

27  period within which their claim was finally reported to Zurich,
and that they spent money on such investigation during that time.

28  Pls.' Reply in Support of Mot. for Summ. J., 17:10-12.

1      Plaintiffs' attempt to differentiate between the Board's
2  directives in requiring investigation and cleanup activities is
3  no more successful.  Plaintiffs argue that a claim did not arise
4  until July of 2005 (and within the policy period in which the
5  release was finally reported in January of 2006), because the
6  Board's July 13, 2005 letter was the correspondence that finally
7  requested "in no uncertain terms" that Plaintiffs "cleanup and
8  abate the contamination."  Pls.' Opp'n, 9:24-26.  Because the
9  term cleanup unquestionably includes investigation, because the
10 Board's July 2003 ordered that investigation be performed, and
11 because investigation was in fact underway by 2004, if not
12 earlier, Plaintiffs' reliance on the July 13, 2005 Order, as
13 constituting the first governmental directive triggering the
14 obligation to provide notice, is untenable.

15      Plaintiffs further argue that the Zurich policy's notice
16 provisions for "potential claims" are ambiguous and conflict with
17 the insuring clause's requirement that a "claim" be submitted.
18 Plaintiffs appear to contend that because a "claim" entails
19 "necessary expenses incurred" under the terms of the policy, if
20 coverage is predicated on a "potential claim" no such expenses
21 may yet have been necessary.  Again, the Court is unpersuaded.
22 The Notice of Potential Claim provisions in the Zurich policy in
23 fact operate to mollify the insuring clause's requirement that
24 claims be discovered within the policy period by authorizing an
25 extended reporting period for the actual claim if the insured has
26 timely made a notice of potential claim.  This requirement,
27 rather than conflicting with the insuring clause, instead affords
28 additional protection to the cautious insured.

It does not change the definition of a "claim"; instead, the reporting requirement for a potential claim merely extends the time within which a timely "claim" may be made.

**B.  The "known loss" exclusion also bars coverage.**

Even if Plaintiffs could come within the policy's insuring clause, as stated above Exclusion A of the Policy bars coverage for any "release" that is known to an "insured" prior to the policy period.  Because Plaintiffs undisputedly knew about the release before the inception of the applicable policy period of March 29, 2005 (the policy period in which the claim was first reported to Zurich in January of 2006), the "known loss" exclusion independently prohibits coverage.

In <u>Advanced Micro Devices, Inc. ("AMD") v. American Surplus Lines Ins. Co.</u>, 199 Cal. App. 3d 791, 802 (1988), the insured, like Goyal here, purchased a policy that was successively renewed.  <u>Id</u>. at 793.  The policy at issue in <u>AMD</u> contained a "known loss" exclusion similar to that contained in Zurich's policy.  When a pollution claim was ultimately made, AMD's insurer denied coverage because evidence showed that AMD had knowledge of the contamination before inception of the first policy period.  The court rejected AMD's argument that the exclusion should be read narrowly in requiring actual proof of polluting conditions, as opposed to proof that AMD "might have known", or "should have known" of the conditions, stating that:

///

///

16

... "courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists.  Under any interpretation consistent with common usage, the language of the pre-existing knowledge exclusion applies to the facts of this case. The undisputed evidence reveals that AMD had actual knowledge of a problem of [pollutant] contamination in System "C" before inception of the policy; it was uncertain only of the extent of the problem"....

Id. at 801.  Although the AMD decision is a California case, it was subsequently cited with approval by the Federal District Court for the Southern District of New York in Stonewall Ins. Co., v. National Gypsum Co., 1991 U.S. Dist LEXIS 19146 at *28 (S.D.N.Y. 1991).

Given Plaintiffs' undisputed knowledge of the contamination prior to the policy term at issue, both common sense and applicable case law accordingly dictate that the exclusion applies and Plaintiff's claims against the Zurich policy fail.

**C.   In the absence of coverage, Plaintiffs cannot state a claim for breach of the implied covenant of good faith and fair dealing.**

Although New York law governs the interpretation and meaning of the Zurich policy in accordance with policy provisions to that effect, whether or not Plaintiff can maintain their extracontractual claims goes beyond the parties' choice of law agreement and therefore must be determined pursuant to the law of the forum state, here California.  Absent a finding of coverage, a cause of action for breach of the implied covenant of good faith and fair dealing must fail.  See Gruenberg v. Aetna Ins. Co., 9 Cal. 3d 566, 574 (1973); Horsemen's Benevolent and Protective Ass'n v. Ins. Co. of N. America, 22 Cal. App. 3d 816, 822 (1990).

**CONCLUSION**

For all the foregoing reasons, Plaintiffs are unable, as a matter of law, to establish coverage under the Zurich policy at issue, both because their failure to abide by notice provisions contained within the policy precludes any grant of coverage in the first place and because the exclusion for "known losses" bars coverage in any event.[9]  Summary judgment in Zurich's favor is accordingly GRANTED.[10]  Given the Court's finding in that regard, Plaintiffs' own Motion for Summary Judgment necessarily fails and is DENIED on that basis.

IT IS SO ORDERED.

Dated: July 8, 2009

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[9] Because the plain language of the Zurich policy precludes coverage, it is not necessary to resort to Zurich's secondary argument; namely, that even aside from the terms of the policy, S & L Oil cannot qualify for coverage because Nick Goyal, and not S & L, was the only named insured under the policy.  Although Zurich contends that S & L, as owner of the Ynez Shell Station, consequently has no standing to make a claim under the policy, and Goyal has no right to do so either because he did not personally own the Station, the Court has decided the matter based on the policy terms alone and consequently need not reach Zurich's alternative argument.

[10] Because oral argument will not be of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Cal. Local Rule 78-230(h).